**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:11-cv-00167-BR**

| | | |
|---|---|---|
| Rumualdo Lainez and Marvin Rivas Maldonado, | ) ) ) | |
| Plaintiffs, | ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT** |
| | ) ) ) | |
| v. | ) ) | |
| Francisco Baltazar, Jr., | ) ) | |
| | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT FRANCISCO
BALTAZAR, JR.**

## I.     SUMMARY OF CASE

Plaintiffs Rumualdo Lainez and Marvin Rivas Maldonado are migrant farmworkers who were victims of a human trafficking scheme. Defendant Francisco Baltazar, Jr. lured Plaintiffs from Florida to a farm labor camp in North Carolina with fraudulent promises of ample work, adequate housing, and free transportation to the job. The Defendant then brought Plaintiffs to a substandard labor camp before regular work was scheduled to begin. Upon arrival, Defendant offered Plaintiffs minimal work, underpaid Plaintiffs, and took actions to trap Plaintiffs and the other crewmembers into debt including threatening violence against workers who try to leave. Plaintiffs were eventually rescued when law enforcement intervened. Plaintiffs seek to redress the wrongs they suffered in connection with their employment by Defendant, and bring claims

under the Fair Labor Standards Act, 29 U.S.C. §§201, *et seq*. ("FLSA"), the Trafficking Victims Protection Act,18 U.S.C. §§1581, *et seq*. ("TVPA"), the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801, *et seq*. ("AWPA"), and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.1, *et seq*. ("NCWHA"). Plaintiffs seek damages, declaratory relief and injunctive relief, pre- and post- judgment interest, costs of the action, attorneys' fees, and other appropriate relief. Plaintiffs move for default judgment and assessment of damages on their claims against Defendant.

## II.    PROCEDURAL HISTORY

Plaintiff Lainez and Plaintiff Rivas filed this action on April 8, 2011, bringing claims under the Fair Labor Standards Act, 29 U.S.C. §§201, *et seq*. ("FLSA"), the Trafficking Victims Protection Act, 18 U.S.C. §§1581, *et seq*. ("TVPA"), the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§1801, *et seq*. ("AWPA"), and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.1, *et seq*. ("NCWHA") against Defendants Francisco Baltazar, Sr. ("Francisco Baltazar, Sr."), Francisco Baltazar, Jr. ("Junior Baltazar"), Across the Lake Farming Company, Inc., Douglas Tart, Ann Tart, and Michael Tart. ECF Docket No. 1

Plaintiffs voluntarily dismissed all claims against Tart Defendants and Francisco Baltazar, Sr. on May 7, 2012. ECF Docket Nos. 42-44. The remaining defendant in this action is Defendant Junior Baltazar.

On December 15, 2011 Plaintiffs served the Summons and Complaint on Defendant by effecting substituted service of process on his designated agent, US Secretary of Labor, by mail. Ex. 22, Affidavit of Counsel, ¶2. The US Secretary of Labor is a designated agent for Defendant pursuant to Section 102(5) of the AWPA, 29 U.S.C. §1812(5).

Under Rule 12 of the Federal Rules of Civil Procedure, Defendant had 21 days from the time of service to file responsive pleadings. This 21 day allowance expired for Defendant on January 6, 2012. Plaintiffs sought an Entry of Default, and the Court entered default against Defendant on June 8, 2012. ECF Docket No. 46. Under Federal Rule of Civil Procedure 8(d), Defendant's failure to answer or otherwise defend constitutes an admission of all averments in Plaintiffs' Complaint. Plaintiffs now seek default judgment against Defendant on all of their claims under Rule 55(b)(2) of the Federal Rules.

## III.    STATEMENT OF FACTS

### A.  Defendant Recruited Workers Using Fraudulent Promises Regarding the Terms of Their Employment

The facts of this case are no longer in dispute. In April 2009, Defendant recruited Plaintiff Lainez and Plaintiff Rivas for employment in North Carolina through advertisements placed by the Baltazars in Ft. Pierce, Florida offering work in the cultivation and harvesting of tobacco in North Carolina. ECF Docket No. 1, ¶23. Over the phone, Defendant offered each Plaintiff work for a certain number of months planting and harvesting tobacco for $7.00 per hour in North Carolina. *Id.* at ¶25. Defendant told Plaintiffs that the grower would provide them with housing and that work would begin the day after they arrived at the labor camp and that their ride from Florida to North Carolina was free of charge. *Id.* at ¶¶26, 27. Relying on these promises, Plaintiffs accepted Defendant's offer of employment and made arrangements to meet him.

On April 18, 2009, Defendant transported Plaintiffs from their homes to the Baltazar residence in Ft. Pierce where many workers had gathered. The workers departed for North Carolina in two vehicles. *Id.* at ¶29. The Baltazars drove Plaintiffs to the Tart Labor Camp at 6928 Godwin Lake Road in Dunn, North Carolina. *Id.* at ¶¶29, 30, 34. At all times relevant to this action, Defendant was not a registered farm labor contractor and was not authorized by the

United States Department of Labor ("USDOL") to house or transport migrant agricultural workers. *Id.* at ¶32. At no time did Defendant provide Plaintiffs with the required written disclosures about the terms and conditions of employment he was offering. *Id.* at ¶¶28, 33.

### B. Defendant Instituted a System of Debt Bondage upon Arrival in North Carolina.

The Tart Labor camp consists of several attached structures located at the end of a long dirt path that ultimately connects to the public road. *Id.* at ¶34, Ex. 1, 2. Defendant housed workers, including the Plaintiffs, in the structure farthest from the road while Defendant and his family resided in the structure nearest to the road with windows. *Id.* at ¶35, Ex. 2. The Baltazars had a clear view of anyone who attempted to enter or leave the camp. *Id.* Defendant and his family determined, monitored and regulated exit and entry into the camp. *Id.*

When the Plaintiffs arrived at the Tart Labor Camp, Defendant and his family seized control of the camp's kitchen and prohibited the workers from using it to prepare their meals. *Id.* at ¶36. Without access to kitchen facilities, Plaintiffs had to purchase prepared meals sold by Defendant at prices inflated well-above the actual costs to prepare and provide the meals. *Id.* at ¶37. For example, breakfast meal might consist of a roll and a coffee and a dinner meal might consist of a small plate of rice and beans and three corn tortillas. Ex. 20, Lainez Declaration, ¶10. Defendant profited from charging $189.00 every other week for the 2 paltry meals a day, regardless of whether workers actually ate the prepared meals. ECF Docket No. 1, ¶¶ 37, 60. Defendant marked the deduction as "*Comida* [food]" on Plaintiffs' pay stubs. Ex. 23, Lainez Paystub. Due in part to these expenses, Plaintiff Lainez and Plaintiff Rivas began to fall into debt to the Baltazars. ECF Docket No. 1, ¶37.

In addition, after arrival at the Tart Labor Camp, Francisco Baltazar, Sr. told the Plaintiffs that they were each required to pay $200.00 for the ride from Florida and that they could not

leave until they had paid this debt. *Id.* at ¶39 Francisco Baltazar, Sr. knew that few, if any, of the workers on the crew could afford $200.00, and that they would be dependent upon him and his family to work their way out of debt. *Id.* Defendant, brandishing a pistol, stood by his father during the announcement of the $200.00 travel fee. Ex. 21, Rivas Declaration, ¶6. Defendant was constantly armed in the Plaintiffs' presence, carrying a pistol in his belt while in the Tart Labor Camp and in the tobacco fields. *Id.*

During the several weeks they were at the camp, Defendant offered only a few days work to Plaintiffs setting tobacco plants. *Id.* at ¶40. With minimal work and little income, the Plaintiffs were unable to repay their mounting debts to the Defendant. *Id.*

### C. Defendant Used Threats and Weapons to Keep Plaintiffs In Debt Bondage

After waiting for several days with no work and mounting debts to Defendant, some workers began various attempts to escape the camp. A small group of people escaped from the Tart Labor Camp during the night on or about April 22, 2009. ECF Docket No. 1, ¶41. Francisco Baltazar, Sr., accompanied by Defendant brandishing a pistol, responded by telling the workers, including Plaintiffs, that he would not allow anyone to come and get them from his camp and he threatened violence against anyone tried to help workers leave the camp. ECF Docket No. 1, ¶42, Ex. 21, Rivas Declaration, ¶7. A second group fled a few days later, also during the night. Defendant responded to the group running down the dirt path to Godwin Lake Road by firing gunshots at the fleeing workers. ECF Docket No. 1, ¶43.

That same night, wielding a gun, Defendant burst into Plaintiffs' room without their permission and turned on the light. He told Plaintiffs that he was counting them to determine how many workers had escaped. ECF Docket No. 1, ¶44. The following morning, Francisco

Baltazar, Sr. gathered the crew and told them that his sons, including Defendant, had orders to shoot any worker who tried to leave without paying his debt. *Id.* at ¶45.

The third and largest group fled the camp at night either April 29, 2009 or April 30, 2009. This group of workers lived together in the larger barracks-style room on the side of the Tart Labor Camp. At this time, Plaintiffs occupied a different room in the back of the labor camp and did not know of the others' plan to escape. In the morning, Defendant opened the door to Plaintiffs' room and looked in to verify that Plaintiffs had not yet escaped. *Id.* at ¶47. Fearing the Baltazars and believing that Defendant would harm them if they tried to escape, Plaintiffs remained at the labor camp and continued working. *Id.* at ¶46.

### D. Plaintiffs Escaped from the Baltazars and the Tart Labor Camp Under the Protection of Local and Federal Law Enforcement

While holding Plaintiffs captive, Defendant forced Plaintiffs to work for substandard wages amid mounting debt and compelled their work through physical and psychological coercion including threats of grave physical harm. *Id.* at ¶49. A relative of one of the escaped workers contacted the National Human Trafficking Resource Center Hotline operated by the Polaris Project. *Id.* at ¶¶47, 50. In response to the hotline call, on May 4, 2009, Federal law enforcement agents accompanied by Johnston County Sheriff's Deputy Gary Nord went to the Tart Labor Camp. *Id.* at ¶51. The Federal agents and Deputy Nord located the Baltazars' spent gun casings from the night that the Baltazars shot at the workers fleeing the camp described above. *Id.* at ¶52, Ex. 24, Nord Declaration. Plaintiffs were finally able to safely leave the camp in the presence and under the protection of these local and Federal law enforcement agents. ECF Docket No. 1, ¶53.

### E. Defendant Violated Plaintiffs' Rights Under Basic Labor Laws.

Defendant provided minimal work to Plaintiffs setting tobacco plants on a farm operated by Douglas and Ann Tart. *Id.* at ¶¶ 54, 55. Each workday, Defendant and his family transported Plaintiffs between the Tart Labor Camp and the fields where they worked. *Id.* at ¶56. Defendant supervised Plaintiffs in the fields. Ex. 21, Rivas Declaration, ¶8. In the fields, the Defendant failed to comply with mandatory field sanitation requirements by failing to provide Plaintiffs with disposable cups for drinking water or toilet facilities within 1/4 mile walking distance from Plaintiffs' work site. ECF Docket No. 1, ¶57. At the Tart Labor Camp, Defendant housed Plaintiffs in substandard conditions, including, among other things, overcrowded living quarters. *Id.* at ¶70. Although Defendant housed over 35 workers in addition to the Baltazar family at the labor camp, it was only registered with the local certifying agency, the North Carolina Department of Labor to house 24 individuals total. *Id.* at ¶71, Ex. 20, Lainez Declaration, ¶3. The housing was so overcrowded upon arrival that Plaintiff Lainez had to sleep on the floor of the worker barracks. Ex. 20, Lainez Declaration, ¶4, Ex. 21, Rivas Declaration, ¶4. Plaintiff Rivas was provided with an old, dirty mattress to sleep on the floor. Ex. 21, Rivas Declaration, ¶5. When workers fled and Plaintiffs were moved to another part of the labor camp, Defendant provided Plaintiffs with old, stained, bare mattresses in disrepair to sleep on. ECF Docket No. 1, ¶70.

Defendant failed to pay Plaintiffs their full wages owed when due during the 2009 harvest. *Id.* at ¶64. Defendant's failure to pay for all hours worked, coupled with his unlawful deductions, caused Plaintiffs to be paid less than both the promised wage of $7.00 per hour and the Federal minimum wage of $6.55 per hour for each workweek during which they were employed. *Id.* at ¶¶66-68. On payday, Defendant gave Plaintiffs envelopes containing cash and wage statements containing incomplete and inaccurate wage information. Ex. 23, Lainez

Paystub. These were the only wage statements Plaintiffs received. ECF Docket No. 1, ¶61 The

Defendant failed to make, keep and preserve payroll records that accurately reflected Plaintiffs'

wages, dates of work, and hours of work for each Plaintiff for each pay period. *Id.* at ¶62.

Defendant also failed to provide Plaintiffs with an accurate itemized, written wage statement for

each pay period Plaintiffs worked for him. *Id.* at ¶63.

Defendant withheld from Plaintiffs' wages for payments towards his exorbitant food

charges at the labor camp without Plaintiffs' advance written authorization. *Id.* at ¶65. Also,

despite making the deductions from Plaintiffs' pay, the Defendant failed to accurately report

Plaintiffs' wages to the Social Security Administration, to make the required withholdings for

Social Security (FICA) and Medicare taxes from Plaintiffs' pay, and to pay the required

employer's share to the Social Security Administration. *Id.* at ¶69, Ex. 23, Lainez Paystub, Ex.

25, Lainez Social Security Statement of Earnings.

## IV.    ARGUMENT

### A.  Standard for Default Judgment

The Federal Rules of Civil Procedure dictate that a party who "has failed to plead or

otherwise defend as provided by these rules" is in default. Fed. R. Civ. P. 55. When a party has

defaulted, either the Clerk of the Court or the Court may enter default judgment. *Id.* The Clerk of

Court must enter default judgment when the plaintiff's claim is for a sum that is "certain" or "can

be made certain by computation." Fed. R. Civ. P. 55(b)(1). In cases where the claim amount is

not certain, the Court may enter default judgment. Fed. R. Civ. P. 55(b)(2).

By defaulting, a Defendant admits each well-pleaded factual allegation within the

plaintiff's complaint and is thereby "barred from contesting on appeal the facts thus established."

*See Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (citing *Nishimatsu*

*Constr. Co. Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)) (as cited in *Arista Records LLC v. Gaines*, 635 F. Supp. 2d 414, 416 (E.D.N.C. 2009)). Although the Defendant's default alone does not require the court to enter a default judgment, entry of default judgment is appropriate when the facts support the claim and relief sought. *Ryan*, 253 F.3d at 780.

When the court finds that liability has been established, it must determine damages. *Id.* at 780-81. The court may rely upon affidavits or documentary evidence within the record to determine damages, or the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2). However, the court has discretion to enter a default judgment "without a hearing of any kind," when jurisdiction is established, the complaint states a "specific, cognizable claim," and the party in default has received fair notice. *Banco Bilbao Vizcaya Argenteria v. Family Rests., Inc.*, 285 F.3d 111, 114 (1st Cir. 2002) (citing *HMG Property Investors v. Parque Indus. Rio Canas*, 847 F. 2d 908, 919 (1st Cir. 1988)) (internal quotations omitted).

In this Memorandum, Plaintiffs demonstrate that the Complaint, as supported by Plaintiffs' accompanying declarations, exhibits, and other evidence, provides sufficient support for default judgment against Defendant and an award of the full damages sought.

### B. The Court has Jurisdiction Over the Subject Matter and the Parties

Plaintiffs have brought claims under three federal statutes: the FLSA, AWPA, and the TVPA as well as state claims under the NCWHA. Jurisdiction of this matter is proper pursuant to: 28 U.S.C. §1331 (Federal Question); 28 U.S.C. §1337 (Interstate Commerce); 18 U.S.C. §1595(a) (TVPA); 29 U.S.C. §216(b) (FLSA); 29 U.S.C. §1854(a) (AWPA); and 28 U.S.C. §1367 (Supplemental Jurisdiction). Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to these claims took place in Johnston County, North Carolina. ECF Docket No. 1, ¶34.

### C. Claim by Claim Analysis[1]

#### 1. Plaintiffs are Entitled to Judgment for their FLSA Claims[2]

In Plaintiffs' First Claim for Relief, Plaintiffs bring suit under 29 U.S.C. §206(a) and seek actual and liquidated damages for FLSA violations for failure to pay the applicable minimum wage.[3] 29 U.S.C. §216(b) establishes a private right of action for a plaintiff under the FLSA, permitting the employee to recover damages "in the amount of their unpaid minimum wages...and in an additional amount of liquidated damages," in addition to attorneys' fees and costs of the action. Plaintiffs have pled facts and submitted declarations and exhibits which establish violations of the FLSA and substantiate significant damages.

Plaintiffs' allegations establish that Defendant was their employer as defined by the FLSA. The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d). The Supreme Court has stated that "[a] broader or more comprehensive coverage of employees...would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945). Defendant employed a crew of agricultural workers, including Plaintiffs, for a farm operated by Ann and Douglas Tart. Defendant performed supervisory activities over Plaintiffs typical of a farm labor contractor. Among other things, Defendant recruited, transported, housed and supervised Plaintiffs in the field. ECF Docket No. 1, ¶24-27, 30, 34-35, 55-56. Defendant doled out Plaintiffs' pay. *Id.* at ¶61, Ex. 20, Lainez Declaration, ¶11. Plaintiffs were also "engaged in commerce or the production of goods for commerce" as required by the FLSA, as they worked for Defendant in

---

[1] Specific claim by claim damages are set forth in Part 5 of this section entitled "Damages."
[2] Note that Plaintiffs decided not to proceed with allegations that Defendant's violations of the Fair Labor Standards Act were willful as originally pled in the Complaint. Claims for violations under the FLSA must be commenced within two years after the cause of action accrued, or within three years if the violation is willful. 29 U.S.C. §255(a). The cause of action was filed within two years after the cause of action accrued making an argument regarding the willfulness of Defendant's violations moot.
[3] Note that Plaintiffs did not bring any claims under the FLSA regarding recordkeeping violations in this action.

the cultivation and harvest of tobacco intended for sale in interstate commerce. *See* 29 U.S.C. §206(a); ECF Docket No. 1,¶¶6,8,10,54.

Defendant's failure to pay Plaintiffs for all hours worked brought their pay below the Federal minimum wage for each hour worked in each workweek in violation of 29 U.S.C. §206. Defendant purported to have compensated Plaintiffs at the rate of $7.00 per hour. However, Defendant paid Plaintiffs based on a lower number of hours than they actually worked and provided them with paystubs reflecting this inaccurate, lower number. ECF Docket No. 1, ¶61, 66, Ex. 20, Lainez Declaration, ¶11, Ex. 23, Lainez Paystub. When Plaintiffs worked for Defendant in the spring of 2009, the Federal minimum wage was $6.55 per hour. 29 U.S.C. §206(a)(1)(B). As a result, Plaintiffs' wages fell below the Federal minimum wage for each hour worked in each workweek.

Defendant further reduced Plaintiffs' wages by charging Plaintiffs exorbitant rates for meals at Defendant's company store. Pursuant to the FLSA, an employer may not make a deduction from an employee's pay that brings that pay below the minimum wage unless (1) the amount deducted represents the reasonable costs of certain facilities customarily furnished by the employer, such as the reasonable cost of board and lodging, (2) the employee actually and voluntarily received the benefit, (3) the benefit is not furnished in violation of any Federal, State, or local law, and (4) the benefit is not furnished primarily for the benefit or convenience of the employer. *See* 29 U.S.C. §203(m); 29 C.F.R. §531.30-31. Meals are always regarded as primarily for the benefit and convenience of the employee. 29 C.F.R. §531.32(c). Thus, the employer's *actual cost* of furnishing the meals may be counted toward the minimum wage requirement, provided that these items are voluntarily accepted and not furnished in violation of law.

However, the permitted, "reasonable cost" may not exceed the actual cost to employer to include a profit to the employer. 29 C.F.R. §531.3(a), 29 C.F.R. §531.3(b). The employer has the burden of proving reasonable cost through records or other credible evidence. 29 C.F.R. §516.27; *Ortiz v. Paramo,* 2009 U.S. Dist. LEXIS 111939, 9 (D.N.J. Dec. 1, 2009) (*citing Leach v. Johnston*, 812 F. Supp. 1198, 1213 (M.D. Fla. 1992)). In the absence of such proof, the employer is entitled to no credit whatsoever against minimum wage obligations. *Id.*

In the case at hand, Defendant and his family seized control of the Tart Labor Camp kitchen and forced workers, including the Plaintiffs, to buy Defendant's highly-priced prepared meals. ECF Docket No. 1, ¶¶36-37. Meal purchase was compulsory, not voluntary. *Id.* at ¶37. Also, Defendant made a profit by charging prices well-above the actual costs of the meals. *Id.* Defendant, by failing to answer, has not met his evidentiary burden regarding the actual costs of the prepared meals, and, therefore, is not subject to a minimum wage credit for the cost of these meals. Defendant's unlawful, inflated charges for food and the compulsory nature of these charges brought Plaintiffs' pay below the Federal minimum wage for each hour worked for Defendant in each workweek and constitute a violation of 29 U.S.C. §206.

Lastly, Defendant also violated Plaintiffs' FLSA rights when Defendant took deductions from Plaintiffs' wages for purported taxes that were never sent or reported to the appropriate government agency. The employee's FICA share and other employment taxes may be deducted and counted toward minimum wages paid, but only if the employer actually pays the taxes to the appropriate government agency. 29 C.F.R. §531.38.  Defendant willfully devised a scheme in which he deducted approximately 7.65% of Plaintiffs' gross pay for deductions specifically itemized as "Less Social Security" and "Less Medicare," yet those sums were never remitted. ECF Docket No. 1, ¶¶ 66, 69, Ex. 23, Lainez Paystub, Ex. 26, Lainez Social Security Earnings

Statement. Because these sums were never remitted, Defendant's deductions unlawfully dropped Plaintiffs' wages even further below the Federal minimum wage in violation of 29 U.S.C. §206.

Based upon Defendant's failure to pay Plaintiffs the Federal minimum wage, Plaintiffs suffered damages. Plaintiffs are entitled to the difference between Defendant's actual pay rate and the FLSA minimum wage at the time the work was performed of $6.55 per hour. *See* 29 U.S.C. §206(a). Furthermore, Plaintiffs are entitled to an award of liquidated damages, attorneys' fees, and costs of the action. *Id.*

## 2. Plaintiffs are Entitled to Judgment for their TVPA Claims

The admitted facts set forth above establish liability for Plaintiffs' Second Claim for Relief under the TVPA for Defendants' violations of forced labor and human trafficking laws. 18 U.S.C. §§1589, 1590 (2000). The TVPA prohibition on forced labor "is intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery." H.R. Conf. Rep. No. 106-939 at 101 (2000), 2000 SL 1479163 (Oct. 5, 2000).

Trafficking victims are entitled to a civil remedy against their perpetrator and anyone who "knowingly benefits, financially or by receiving anything of value" by participating in a trafficking scheme. *Id.* The TVPA private right of action empowers victims to claim attorneys' fees and damages. 18 USC §1595(a).

### i. Forced Labor (18 U.S.C. §1589)

To establish civil liability for forced labor within the meaning 18 U.S.C. §1589, Plaintiffs must prove by a preponderance of the evidence that (1) Defendant obtained the labor or services of another person; (2) Defendant did so through prohibited means including: (a) serious harm or threats of serious harm to the worker or another person; or (b) through a "scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm" to the

worker or another person; or (c) through the abuse or threatened abuse of the law; and (3)

Defendant acted knowingly. 18 U.S.C. §1589 (2000); *see also United States v. Sabhnani*, 539 F.

Supp. 2d 617, 629 (E.D.N.Y. 2008).

"Serious harm" encompasses more than physical harm. Serious harm can include

nonphysical harm including psychological, financial, or reputational harm. 18 U.S.C.

§1589(c)(2). This threat of harm is measured by a standard that inquires whether a reasonable

person in the victim's place would feel that the harm was "sufficiently serious" to compel further

work in order to avoid incurring that harm. *Id.* §1589's terms and provisions "are intended to be

construed with respect to the individual circumstances of victims that are relevant in determining

whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain

a victim's labor or services, including the age and background of the victims." H.R. Conf. Rep.

No. 106-939 at 101 (2000), 2000 SL 1479163 (Oct. 5, 2000). Thus, forced labor has occurred

when a worker is intentionally made to believe that if he stops working he will be subjected to

serious physical or non-physical harm, such that a worker in similar circumstances would feel

compelled to continue working. *United States v. Dunn*, 652 F. 3d 1160, 1170 (9th Cir. 2011).

Threats of harm towards an individual's co-workers upon their escape constitutes the

threat of serious harm towards the individual. *United States v. Bradley*, 390 F.3d 145, 148-149,

152 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005) (affirming jury's finding of

"serious harm" where an employer prohibited employees from leaving their employment with

him until they reimbursed him for transportation costs, and then informed remaining employees

of his plans to have an escaped employee shot or "destroyed."); *Canal v. Dann*, No. 09-03366,

2010 WL 3491136, at *2, 4 (N.D. Cal. Sept. 2, 2010) (finding family liable for forced labor

where the family forced a housekeeper to work without pay, arguing she owed a them over $13,000, and threatened her with arrest and deportation) (attached).

Here, Defendant obtained Plaintiffs' labor through threats of serious harm to Plaintiffs and anyone attempting to assist them. ECF Docket No. 1, ¶¶ 42, 45. Similar to *Canal* and *Bradley*, Plaintiffs were held at the Tart Labor Camp under the pretense of a mounting debt owed to the Defendant. *See Canal*, 2010 WL 3491136, at *1; *Bradley*, 390 F.3d at 148. Unlike *Bradley*, Defendant demonstrated the grave nature of his threats, thus substantiating Plaintiffs' fears, when he shot at workers fleeing the Tart Labor Camp. ECF Docket No. 1, ¶43. The following morning, Defendant's father told Plaintiffs that his sons had orders to shoot any worker who tried to leave without paying his debt. *Id.* at ¶45. Law enforcement officers found spent casings around the camp, corroborating Plaintiffs' statements. *Id.* at ¶52. Plaintiffs feared Defendant and believed they would suffer violence if they attempted to escape. *Id.* at ¶46. Thereby, these threats ensured Plaintiffs' continued labor for Defendant. *Id.* at ¶46. A reasonable person in the Plaintiffs' place would find the threats sufficiently serious to compel further work.

Finally, Defendant acted knowingly, intending to coerce Plaintiffs' continued labor and unwilling presence at Tart Labor Camp by engaging in a series of coercive behaviors intended to trap Plaintiffs in mounting debt and calculated to compel Plaintiffs to work for him. Defendant, through his cohort Francisco Baltazar, Sr., lied about transportation charges to ensure that Plaintiffs arrived in debt. *Id.* at ¶39. Furthermore, Defendant intentionally seized control of the kitchen in order to exacerbate Plaintiffs' debt by charging exorbitant food costs. *Id.* at ¶37. Defendant knew that Plaintiffs did not have financial resources to repay the debt to him. *Id.* at ¶40. Furthermore, Defendant brandished weapons against Plaintiffs to discourage workers from attempting to flee, and he used a firearm to shoot at workers fleeing the camp. *Id.* at ¶¶43-45.

The evidence overwhelmingly supports a conclusion that Defendant knowingly engaged in forced labor against the Plaintiffs. Based upon this set of facts, Defendant is liable to Plaintiffs for damages resulting from forced labor.

## ii. Human Trafficking (18 U.S.C. §1590)

The TVPA provides for separate civil liability for trafficking, apart from forced labor liability. 18 U.S.C. §1590(a) (2003) (amended 2008) (establishing liability for human trafficking); 18 U.S.C. §1595 (forced labor). Trafficking, in violation of 18 U.S.C. §1590, is established when the defendant "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" in order to subject that person to forced labor or involuntary service.  18 U.S.C. §1590(a); *Samirah v. Sabhnani*, 772 F. Supp. 2d 437, 448 (E.D.N.Y. 2011).[4] Civil liability for trafficking in violation of §1590 requires a demonstration by a preponderance of the evidence that Defendant (1) knowingly recruited, harbored, transported, provided or obtained Plaintiffs' labor by any means for (2) "labor or services in violation of this chapter." 18 U.S.C. §1590.

Defendant's separate and distinct trafficking liability under §1590 arose when Defendant used fraudulent misrepresentations to lure Plaintiffs to travel from their homes in Florida to the Tart Labor Camp in North Carolina for the purpose of subjecting them to forced labor. *See* ECF Docket No. 1, ¶ 23. Defendant placed advertisements requesting Ft. Pierce workers who were willing to relocate and work in North Carolina's tobacco crop. *Id*. He recruited Plaintiffs in subsequent phone conversations, promising free transportation, free housing, immediate and abundant work, and a pay rate above the minimum wage. ECF Docket No. 1, ¶¶25-27.

---

[4] These statutes are not duplicative because they each "require proof of a fact which the other does not." *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *United States v. Maka*, 237 Fed. Appx. 225, 227 (9th Cir. 2007). *See also Martinez v. Calimlim*, 651 F. Supp.2d 852, 864 (E.D. Wis. 2009) (finding adult children who helped their parents harbor a domestic servant for the purpose of extracting forced labor from that person subject to civil trafficking liability, and finding their parents liable for both forced labor and trafficking).

Defendant then arranged to harbor Plaintiffs in isolation at Tart Labor Camp and assisted with transporting Plaintiffs to the camp from Florida. *Id.* at ¶¶29-30, 32. Furthermore, on workdays Defendant transported workers between the camp and the field where they worked. *Id.* at ¶56. Finally, Defendant provided Plaintiffs' labor to the Tart farming operation. *Id.* at ¶54. Defendant is liable for his actions in trafficking Plaintiffs in order to "extract forced labor." *See Martinez*, 651 F. Supp.2d at 864.

### 3. Plaintiffs are Entitled to Judgment for their AWPA Claims

#### i. The parties are subject to the provisions of the AWPA.

Plaintiffs have provided ample allegations establishing each of their claims brought against the Defendant under the AWPA, 29 U.S.C. §1801, *et seq*. The AWPA guarantees protections and benefits to migrant agricultural workers. *See generally* 29 U.S.C. §§1821-1823. Migrant agricultural workers are defined as those who have agricultural employment of a seasonal or temporary nature and who are required to be absent overnight from their permanent place of residence. 29 U.S.C. §1802(8)(A); 29 C.F.R. §500.20(p). An agricultural worker includes any employee engaged in the handling and planting any agricultural or horticultural commodity in its unmanufactured state. 29 U.S.C. §1802(3). The AWPA defines a farm labor contractor as any person who for any money or any other valuable consideration recruits, solicits, hires, employs, furnishes, or transports migrant or seasonal agricultural workers. 29 U.S.C. §1802(7).

The parties are subject to the AWPA's provisions. Plaintiffs left their permanent homes in Florida to work for Defendant in North Carolina, establishing their AWPA status as migrant agricultural workers. ECF Docket No. 1, ¶¶6, 23, 29. Planting tobacco, an agricultural commodity, constitutes AWPA "agricultural employment". 29 U.S.C. §1802(3). During the

spring of 2009, Defendant performed all of the duties enumerated in the AWPA's farm labor contractor definition with respect to the Plaintiffs. Defendant placed advertisements soliciting workers for agricultural work, recruited Plaintiffs through subsequent phone conversations, hired and employed Plaintiffs to work in North Carolina, furnished a workforce for the Douglas and Ann Tart's tobacco operation, and transported both Plaintiffs in relation to this employment. ECF Docket No. 1, ¶¶23-30, 56. Therefore, Plaintiffs were covered by the AWPA while they were employed by Defendant, who was subject to the provisions of the AWPA.

      ii.  <u>Plaintiffs do not need to demonstrate Defendant's intent to violate the law in order to recover for Defendant's AWPA violations.</u>

In order for Plaintiffs to recover for AWPA violations, Defendant's violations must have been intentional. 29 U.S.C. §1854(c)(1). Under AWPA, "intentional" does not require a specific intent to violate the law, but merely "conscious or deliberate" acts. *De Leon-Granados v. Eller & Sons Trees, Inc.*, 2009 U.S. Dist. LEXIS 131024, 10 (N.D. Ga. Sept. 29, 2009) citing *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217, 1224 (7th Cir. 1981); *Maldonado v. Lucca*, 636 F. Supp. 621, 625 (D.N.J. 1986). Plaintiffs do not have to establish a specific intent to violate the law. Courts have interpreted this intentional requirement in this section of the AWPA "as equivalent to the common civil standard holding a person liable for the natural consequences of his or her actions." *Smith v. Bonds*, 1993 U.S. Dist. LEXIS 21326, 31 (E.D.N.C. Sept. 28, 1993) (attached). It is sufficient for Plaintiffs to show that Defendant deliberately engaged in the action that led to the violation. *Wales v. Jack M. Berry*, 192 F. Supp. 2d 1269, 1288 (M.D. Fla. 1999).

      iii.  <u>Written Disclosure at the Time of Recruitment</u>

Defendant intentionally violated one of AWPA's most basic protections when he failed to provide Plaintiffs a written disclosure containing the terms and conditions of the employment at the time of recruitment. As part of its overarching purpose of assuring necessary protections for

migrant and seasonal workers, 29 U.S.C. §1801, the AWPA dictates what information each agricultural employer must ascertain, and disclose in writing, to migrant workers at the time of recruitment. *Castillo v. Case Farms of Ohio, Inc.*, 96 F.Supp.2d 578, 629 (W.D. Tex. 1999). The AWPA requires every recruiter to disclose in writing to each worker, among other terms, key information such as the place of employment, the wage rate to be paid, the crops and kind of activities on which the worker may be employed, the period of employment, the transportation, housing, and any other benefit to be provided, if any, and the costs to be charged for each of them. 29 U.S.C. §1821(a), 29 C.F.R. §§500.75(b)(5) and 500.76(b)(5). The purpose of this provision is to provide each worker with written ratification of all of the material terms of employment so that he or she can make an informed decision about entering into a prospective working arrangement. *See* H.R. Rep. No. 97-885, at 14, 15. *See also Villalobos v. N.C. Growers Ass'n*, 252 F. Supp. 2d 1, 9 (D.P.R. 2001).

Plaintiffs have sufficiently alleged the calculating and deliberate nature of Defendant's duplicitous recruitment acts. In the case at hand, not only did Defendant fail to provide Plaintiffs written disclosures at the time of recruitment before they left their homes in Florida, but Defendant failed to provide disclosures to Plaintiffs at all. ECF Docket No. 1, ¶¶28, 33. Defendant's failure to memorialize those terms and conditions of the job and provide them to Plaintiffs at the time of recruitment more is than a technical misstep. Had Defendant provided Plaintiffs with written disclosures regarding the actual terms and conditions of employment, Plaintiffs could have foreseen that the likely wages were insufficient to cover the debts and could have made the informed decision to reject the job offer. He would not have been able to exploit Plaintiffs' distance from home for a profit. For example, Defendant orally promised Plaintiffs that the ride from Florida to North Carolina was free of charge when, in fact, Defendant and his

family charged Plaintiffs $200 each for transportation after their arrival in North Carolina. ECF Docket No. 1, ¶¶27, 39, Ex. 21, Rivas Declaration, ¶3. Had Plaintiffs received a written disclosure informing them of the actual transportation fee, they could have decided whether or not to accept a short-term job where, at the rate of $7.00 per hour, they would have to work over 28 hours just to pay off the transportation to that job. They could have made this decision before they ever left their homes. Defendant intentionally violated 29 U.S.C. §1821(a) by failing to provide Plaintiffs a written disclosure containing the terms and conditions of the employment at the time of recruitment.

### iv. False or Misleading Information

The AWPA further prohibits farm labor contractors from knowingly providing false or misleading information to any migrant agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed under the Act. 29 U.S.C. §1821(f).[5]

Defendant made false promises to Plaintiffs over the telephone regarding the terms and conditions of the job offer and then exploited Plaintiffs' reliance on those orally proffered terms and their understanding of the prospective offer of employment. For example, Defendant promised Plaintiffs work at $7.00 an hour, but, on pay day, the pay amounted to a significantly lesser hourly wage rate due to Defendant's hours-shorting and deductions. ECF Docket No. 1, ¶25, *see* section (C)(1) *supra*. Defendant promised Plaintiffs that the work would begin the day after they arrived at the labor camp. *Id.* at ¶¶26, 40. Instead, Defendant provided Plaintiff Lainez with 4 days of work and Plaintiff Rivas 3 days for work during the 16 days that they were held at the Tart Labor Camp. Ex. 20, Lainez Declaration, ¶7, Ex. 23. Plaintiffs did not realize that those orally offered terms of employment were patently false until Defendant had already physically

---

[5] For required disclosures, see section (C)(3)(iii), *supra*.

trapped them far from their homes in his dangerous debt bondage scheme. Defendant

intentionally violated 29 U.S.C. §1821(f) of the AWPA by knowingly providing Plaintiffs false

or misleading information concerning the terms, conditions, or existence of agricultural

employment at Douglas and Ann Tart's farming operation in North Carolina.

v.  Make, Keep, and Preserve Records

The AWPA mandates that each agricultural employer make, keep, and preserve records

for each worker. 29 U.S.C. §1821(d)(1). These records must include a number of elements,

including the basis on which wages are paid, the number of piece-work units earned, the number

of hours worked, total pay period earnings, specific sums withheld along with the purpose of

each sum withheld, and the net pay. §1821(d)(1)(A) - (F). Pay records must state the worker's

permanent address and the worker's social security number. 29 C.F.R. 500.80(a).

Defendant failed to make, keep and preserve payroll records that accurately reflected

Plaintiffs' wages and hours worked for each Plaintiff for each pay period. ECF Docket No. 1,

¶62. Defendant failed to answer in the case at hand and has not otherwise produced such records

for Plaintiffs' counsel during the course of this matter. ECF Docket No. 46, Ex. 22, Affidavit of

Counsel, ¶3. The available records do show that the Defendant never intended to generate

accurate records to comply with this provision of the AWPA.  Records submitted by Defendant

to the Tarts for payment are inaccurate and incomplete. They purport a lower number of hours

than the actual number of hours worked and they do not contain information regarding the

specific sums withheld nor the net pay. *See* section (C)(1) *supra*, Ex. 25-5, Defendant Payroll

Chart April 24, 2009.  They do not contain the Plaintiffs' permanent addresses nor the Plaintiffs'

Social Security numbers. *Id.*  Defendant does not even accurately state Plaintiff Rumualdo

Lainez's name which is stated "Romaldo Lienes." *Id.* Defendant intentionally violated 29 U.S.C.

§1821(d)(1) by failing to make, keep, and preserve adequate and accurate records for each Plaintiff.

### vi.  Itemized Wage Statement

The AWPA requires an employer to provide each worker with an itemized wage statement showing each piece of information that they are required to record in their payroll records, discussed in section v, *supra*. 29 U.S.C. § 1831(c)(2), 29 C.F.R. §500.80(d). In addition to the data required to be maintained in the payroll records, wage statements must also show the employer's name, address, and Internal Revenue Service employer identification number. 29 C.F.R. §500.80(d); *Castillo*, 96 F.Supp.2d at 629. The failure to provide an accurate and complete itemized written wage statement is not merely a technical violation of the law. "The failure to provide an itemized wage statement may have serious consequences for a worker by affecting their eligibility for unemployment insurance, their status with the immigration enforcement, and their dealings with the Internal Revenue Service. *Bautista v. Zuniga*, 2012 U.S. Dist. LEXIS 48135, 15 n.1 (E.D.N.C. Apr. 5, 2012) (attached) (citing *Saintida v. Tyre*, 783 F.Supp. 1368, 1375 (S.D.Fla. 1992)).

In the case at hand, Defendant paid Plaintiffs their wages in cash with a written receipt that inaccurately stated the hours worked for the relevant pay period. ECF Docket No. 1, ¶61, Ex. 23, Lainez Paystub. In addition to the inaccuracies, Defendant failed to provide the employer's Internal Revenue Service Employer Identification Number. Plaintiffs did not receive any other wage statement containing correct and complete information. ECF Docket No. 1, ¶61. Defendant thus failed to provide Plaintiffs with an accurate itemized, written wage statement for each pay period. *Id.* at ¶63.

### vii. Pay Wages Owed When Due

The AWPA provides that each farm labor contractor employing migrant agricultural workers must pay the wages owed to the worker when they are due. 29 U.S.C. §1822(a). This is understood to include a failure to pay the Federal minimum wage as required by the FLSA. *Wales*, 192 F. Supp.2d at 1287 (M.D. Fla. 1999). Furthermore, courts have also found that this duty includes paying all FICA taxes due. *See Cardenas v. Benter Farms*, 2000 WL 1372488, 141 Lab. Cas. ¶ 34, 148 (S.D. Ind. 2000) (attached). In this case, Defendant failed both to pay the Federal minimum wage and FICA taxes due, intentionally violating 29 U.S.C. §1822(a) of the AWPA. *See* section (C)(1), *supra*.

viii.          <u>Violating the Terms of the Working Arrangement</u>

Farm labor contractors are prohibited from violating the terms of any working arrangement made by that contractor with any migrant agricultural worker, unless otherwise justified. 29 U.S.C. §1822(c). "There is no precise definition of working arrangement set forth in the statutes." *Aviles v. Kunkle*, 765 F. Supp 358 (S.D. Tex. 1991), *rev'd on other grounds*, 978 F.2d 201 (5th Cir. 1992). The working arrangement has been found to encompass the understanding of the parties, given their mutual knowledge and conduct, as to the expected terms and conditions of employment. *Id.* The "working arrangement" also includes terms which are required by law. *Donaldson v. U.S. Dept. of Labor,* 930 F. 2d 339, 350 (4th Cir. 1991); *Montalvo v. Larchmont Farms, Inc.*, 2009 U.S. Dist. LEXIS 112751, 2009 WL 4573279 (D.N.J. Dec. 3, 2009) (attached); *Elizondo v. Podgorniak*, 100 F. Supp. 2nd 459, 462 (E.D. Mich. 2000). A working arrangement need not be written to be enforceable. *Colon v. Casco, Inc.*, 716 F.Supp. 688 (D. Mass. 1989).

Occupational Safety & Health ("OSHA") regulations for field sanitation establish that toilet and hand-washing facilities "shall be located within a one quarter-mile walk of each hand

laborer's place of work in the fields." 29 C.F.R. §1928.110(c)(2)(iii). OSHA regulations also require the provision of potable water with disposable drinking cups for employees to use while working in the fields. 29 C.F.R. §1928.110(c)(1), (c)(1)(iii). These OSHA regulations have been adopted by the state of North Carolina. 13 N.C.A.C. 7F.0301(2).

Defendant intentionally violated the terms of the working arrangement on multiple counts. In *Elizondo v. Podgorniak*, the court found that a violation of an OSHA field sanitation standard violated the terms of the working arrangement. *Elizondo*, 100 F. Supp. 2nd at 463. *See also Villalobos v. N.C. Growers' Ass'n*, 2001 U.S. Dist. LEXIS 25266, 11-12 (D.P.R. Sept. 5, 2001) (attached). Very similar facts exists in the case at hand. Defendant violated both State and Federal law when he failed to provide Plaintiffs with disposable cups for drinking water or toilet facilities within 1/4 mile walking distance from Plaintiffs' work site. ECF Docket No. 1, ¶57. Defendant intentionally violated the terms of the working arrangement by violating these protections under State and Federal health and safety laws.

ix. <u>Housing Compliance</u>

The AWPA mandates that each person who owns or controls housing for migrant workers is responsible for ensuring that it complies with substantive Federal and State safety and health standards. 29 U.S.C. §1823(a). "Control" means to be in charge of the housing, or to have the authority to oversee, manage, superintend, or administer the housing either personally or through an agent. 29 C.F.R. §500.130 (c). Both Federal and State migrant housing standards require that housing for migrant workers have access to kitchen facility for migrants to prepare their own meals. 29 CFR §1910.142(i)(2); N.C. Gen. Stat. §95-225(g)(2). Standards also require the provision of a bed to each worker that is elevated from the floor with a mattress in good repair and a clean cover. 29 CFR §1910.142(b)(3); N.C. Gen. Stat. §95-225(h).

Defendant controlled the Tart Labor Camp. Defendant was an actual or apparent agent for the Tart's farming operation. ECF Docket No. 1, ¶24. As the Tart's farm labor contractor, Defendant not only managed the labor camp, Defendant directed the areas within the camp the workers would sleep. *Id.* at ¶35. Defendant also controlled specific areas within the camp when Defendant and his family seized control of the camp kitchen facility, denying Plaintiffs access. *Id.* at ¶36. Defendant and his family determined, monitored and regulated exit and entry into the camp. *Id.* at ¶35. Defendant reinforced his tight control over the camp by brandishing a weapon in an around the camp such as during his armed might patrols. *Id.* at ¶¶44-47.

At the Tart Labor Camp, Defendant housed Plaintiffs in substandard conditions that violated Federal and State safety and health standards. Among other things, Defendant housed Plaintiffs in living quarters that were ill-equipped and severely overcrowded. *Id.* at ¶70. Although Defendant housed over 35 workers in addition to the Baltazar family at the labor camp, it was only registered with the local certifying agency to house 24 individuals total. *Id.* at ¶71, Ex. 20, Lainez Declaration, ¶3, Ex. 21, Rivas Declaration, ¶4. Defendant provided Plaintiffs with old, stained, bare mattresses in disrepair to sleep on in the workers' barracks. ECF Docket No. 1, ¶70. Defendant also denied Plaintiffs' access to the kitchen facility at the Tart Labor Camp. *Id.* at ¶36. With these deliberate acts, Defendant intentionally violated 29 U.S.C. §1823(a).

### x.  FLC Registration

All individuals engaged in farm labor contracting must possess a valid registration certificate from the U.S. Department of Labor, specifying which farm labor contracting activities the person is authorized to perform. 29 U.S.C. S 1811(a); *Smith v. Bonds*, 1993 U.S. Dist. LEXIS 21326, 25 (E.D.N.C. Sept. 28, 1993) (attached). The AWPA defines a farm labor contractor to be any person, other than an agricultural employer, an agricultural association, or an employee of an

agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid, performs any farm labor contracting activity. 29 U.S.C. §1802 (7); 29 C.F.R. §500.20(j). The term "farm labor contracting activity" means recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker. 29 U.S.C. §1802 (6); 29 C.F.R. §500.20(i).

At all times relevant to his action, Defendant was not a U.S. Department of Labor licensed farm labor contractor. ECF Docket No. 1, ¶9. Defendant nonetheless performed numerous duties characteristic of a farm labor contractor, including securing work for his crew of agricultural workers, as well as recruiting, hiring, supervising, transporting, and paying migrant workers, including Plaintiffs. *Id.* at ¶¶8, 25-30, 34-37, He also failed to obtain any specific authorizations from the U.S. Department of Labor to house or transport migrant workers, including Plaintiffs, despite the fact that he was engaging in these specific activities. *Id.* at 32. Defendant therefore violated the AWPA by failing to register as a farm labor contractor.

### 4. Plaintiffs are Entitled to Judgment for their NCWHA Claims

#### i. Failure to Pay the Promised Wage

In Plaintiffs' Seventh Claim for Relief, Plaintiffs bring suit under N.C. Gen. Stat. §95-25.22 and seek actual and liquidated damages for failure to pay the promised wage. Plaintiffs have pled facts and submitted declarations and exhibits which establish violations of the NCWHA and substantiate significant damages. The NCWHA requires employers to pay every employee all wages and tips accruing to the employee on the regular payday. N.C. Gen. Stat. §95-25.6. The NCWHA defines "wage" to include promised wages. N.C. Gen. Stat. §95-25.2(16). The NCWHA is modeled after the FLSA. *Laborers' Int'l Union of North America, AFL-CIO v. Case Farms, Inc.*, 127 N.C. App. 312, 314, 488 S.E.2d 632, 634 (1997). The North

Carolina Administrative Code ("the Code") provides that "judicial and administrative interpretations and rulings established under [] federal law" may guide us when interpreting North Carolina laws that are identical to provisions of the FLSA. 13 N.C. ADMIN. CODE 12.0103 (June 2004). *Hyman v. Efficiency, Inc.*, 167 N.C. App. 134, 137, 605 S.E.2d 254, 2004 N.C. App. LEXIS 2181, 10 Wage & Hour Cas. 2d (BNA) 306 (N.C. Ct. App. 2004). Where the court finds a violation of the FLSA for improper deductions, be it actual or *de facto*, defendants are also liable for violation of the NCWHA for failing to pay the promised wage. *Gaxiola v. Williams Seafood of Arapahoe, Inc*., 776 F. Supp. 2d 117, 132, (E.D.N.C. 2011). Any employer who violates this wage payment provision is liable to the affected employees in the amount of their unpaid wage, plus interest. N.C. GEN. STAT. §95-25.22(a). In addition, the court shall award liquidated damages in an amount equal to the amount found to be due. N.C. GEN. STAT. §95-25.22(a)(1). The court may also order costs and fees of the action and reasonable attorneys' fees to be paid by the defendant. N.C. GEN. STAT. §95-25.22(d).

In this case, Defendant promised Plaintiffs payment of $7.00 per hour. ECF Docket No. 1, ¶25. Defendant failed to pay Plaintiffs the promised wage when he failed to pay Plaintiffs for all compensable hours. *See* section (C)(1) supra. Also, Defendant failed to pay Plaintiffs the promised wage when he made unlawful deductions from Plaintiffs' pay such for highly priced meals and unremitted FICA deductions. *Id.* Based upon Defendant's failure to pay Plaintiffs the promised wage, Plaintiffs suffered damages. Plaintiffs are entitled to the difference between Defendant's actual pay rate and the promised wage rate of $7.00 per hour. ECF Docket No. 1, ¶25. Furthermore, Plaintiffs are entitled to an award of liquidated damages, attorneys' fees, and expenses.

ii.  Unauthorized Deductions

North Carolina law permits an employer to withhold wages from an employee's pay when required to do so by law and when the employee has given advance written and signed authorization specifying the reason for the deduction. *See generally* N.C. Gen. Stat. §95.25.8. When the amount of the deduction is known and agreed upon in advance, the employee's written permission must also include the percentage or dollar amount that the employee has authorized the employer to withhold. N.C. Gen. Stat. §95.25.8(2)(iii). If the amount of the deduction is not known in advance, the employee must receive advance written notice of the withholding amount with the opportunity to withdraw authorization. N.C. Gen. Stat. §95.25.8(3)(i)-(iii). In the case at hand, Defendant made deductions from Plaintiffs' pay for food charges at the Tart Labor Camp. ECF Docket No. 1, ¶37, Ex. 23, Lainez Paystub. Defendant did not obtain Plaintiffs' written authorization prior to making these deductions. ECF Docket No. 1, ¶65. Therefore, Defendant is liable for violating N.C. Gen. Stat. §95.25.8.

### 5. Calculation of Damages and Attorneys' Fees

Plaintiffs seek a total award of $17,669.75 from Defendant, including attorneys' fees and expenses.

#### i. FLSA and NCWHA Damages

Plaintiffs seek actual and liquidated damages for Defendant's FLSA violation FLSA in addition to attorneys' fees and costs. Plaintiffs are also entitled to an award of liquidated damages in an equal amount to their unpaid minimum wages. Under 29 U.S.C. §216(b), an employer who violates FLSA's minimum wage provision is liable to the employee "in the amount of their unpaid minimum wages...and in an additional equal amount as liquidated damages." The liquidated damages provision is mandatory, not discretionary. *See Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1118 (4th Cir. 1985). In actions seeking liquidated damages, the employer

bears the burden of establishing a defense that the act or omission was in good faith and that the employer had a reasonable grounds for believing that the act or omission was not a FLSA violation. *See Perez v. Mountaire Farms*, 650 F.3d. 350, 358 (4th Cir. 2011). Here, Defendant defaulted and has thus failed to meet this burden. An award of actual damages and an equal amount in liquidated damages for a total of $633.94 to Plaintiff Lainez and $476.74 to Plaintiff Rivas, respectively, is appropriate. *See* Ex. 27, Damage Calculation.

With regards to the NCWHA, Plaintiffs also seek actual and liquidated damages for Defendant's failure to pay the promised wage in addition to attorneys' fees and costs. Any employer who fails to pay the promised wage is liable to the affected employees in the amount of their unpaid wage, plus interest, and an equal amount in liquidated damages. N.C. GEN. STAT. §95-25.22(a). The NCWHA promised hourly wage rate in this case is 45 cents higher than the FLSA minimum wage of $6.55 at the time the work was performed. *See* 29 U.S.C. §206(a). So as to avoid double recovery for the same violations, should the Court award Plaintiffs full damages under the FLSA, Plaintiffs are entitled to an award of NCWHA actual damages for the difference between the FLSA minimum wage and the NCWHA promised wage. *Gaxiola.*, 776 F. Supp. 2d at 132. Plaintiffs seek an additional amount in liquidated damages. N.C. GEN. STAT. §95-25.22(a)(1). For their unpaid promised wages under the FLSA, Plaintiffs Lainez and Rivas are entitled to actual an equal amount in liquidated damages for a total of $49.06 and $38.26, respectively. Ex. 27, Damage Calculation.

Damages for Defendant's violation of withholding portions of Plaintiffs' wages without Plaintiffs' advance written authorization (N.C. GEN. STAT. §95.25.8 ) under the NCWHA would be duplicative of other damages sought under the same statute for the failure to pay the promised

wage as well as other damages sought under the FLSA. Plaintiffs seek to recoup their damages for this provision through those other statutes.

ii.  <u>AWPA Damages</u>

For 16 AWPA violations, Plaintiffs seek a total award of $8,000.00. The AWPA provides that aggrieved farmworkers bringing civil suits may be awarded up to $500.00 in statutory damages for each AWPA violation. 29 U.S.C. §1854(c)(1). Plaintiffs seek an award of $500.00 in statutory damages from Defendant for 16 intentional AWPA violations. Thus, each Plaintiff seeks an individual award of $4,000.00 and together totaling $8,000.00. Ex. 27, Damage Calculation.

The issue of AWPA statutory damages is left to the discretion of the court. *Beliz v. W.H. McLoad & Sons Packing Co.,* 765 F.2d 1317, 1332 (5th Cir. 1985). The award of damages must send a message about future compliance with the law. Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements. *Beliz*, at 1332, *as cited in Cox v. Bissette*, No. 87-570--CIV-5, 1988 WL 122053 (E.D.N.C Feb. 28, 1988), at *4; (attached). In 1999, one court noted that the $500.00 maximum award was established in 1983 and inflation has decreased the value of this sum since then. *Castillo*, 96 F.Supp.2d, at FN 64. Violations for each plaintiff are counted separately. *Elizondo*, 100 F. Supp. 2d at 462.

The *Beliz* court enumerated factors to determine whether an award achieves Congress' intent  to deter and correct the exploitative practices that have historically plagued migrant farmwork. *Beliz* at 1332. Factors affecting deterrent effect include the total amount of the award, the nature and persistence of the violations, the extent of the defendant's culpability, damage awards in similar cases, the defendant's ability to prevent future violations, the substantive or technical nature of the violations, and the circumstances of each case. *Id.* at 1332, 1333; *see also*

*Aviles v. Kunkle*, 765 F. Supp. 358, 367 (S.D.Tex. 1991), *rev'd on other grounds*, 978 F.2d 201

(5th Cir. 1992) (applying *Beliz* analysis to AWPA cases). Damage awards are higher where

violations result from an abusive disregard of workers' rights. *Aviles* 765 F. Supp. 358 at 368.

In this case, an award of $500.00 per violation is supported by the *Beliz* factors.

Defendant was the central figure behind this exploitative scheme. Defendant conducted the

recruitment, transportation, field supervision, and pay-related activities. ECF Docket No. 1, ¶24-

27, 30, 34-35, 55-56., 61, Ex. 20, Lainez Declaration, ¶11. Defendant's actions plainly indicate

intentional individual AWPA violations. However, when viewed together, the nature of

Defendant's actions is far more egregious than the nature of these same AWPA violations

examined separate and distinct from one another. Defendant's acts were choreographed to extract

the worst form of exploitation from Plaintiffs, human trafficking for forced labor. For example,

Defendant's duplicitous recruitment practices, poor housing conditions, manufactured debts for

food and transportation, and crooked payroll practices taken individually are clear cut violations

of the AWPA. Together, they enabled the Defendant to profit off a scheme in which he

imprisoned farmworkers at a labor camp far from home and forced them to work off a fictitious

debt for fear of their lives. *See* section (C)(2)(ii), *supra*.

The Court should award the full $500.00 statutory damage because the AWPA award

must be significant so as to deter Defendant, an individual likely to perpetrate the same

violations against farmworkers in the future. For example, despite the dramatic law enforcement

intervention and liberation of the Plaintiffs on May 4, 2009, Defendant continued to isolate the

workers at their camps from community contact when, later that season, Defendant denied camp

entry to a local farmworker service provider who visited the Tart Labor Camp to transport a

worker to a local food bank.[6] *See* Ex. 28, Galvan Declaration. Defendant also continued to force the workers at the camp to buy from his "company store" at high prices. In 2010, the North Carolina Department of Labor cited and fined Defendant for denying workers access to the Tart Labor Camp kitchen. *See* Ex. 29, Citation and Notification of Penalty. Because Defendant is likely to be a repeat offender without significant deterrence, an award of $500.00 per violation is justified in this case.

The full $500.00 award has been applied to similar cases. *See Avila v. A. Sam & Sons,* 856 F. Supp. 763, 774 (W.D.N.Y. 1994) (improper registration, transportation authorization, wage statements, recordkeeping); *Castillo v. Case Farms of Ohio,* 716 F. Supp.2d 670 at 694-695 (W.D. Texas 1999) (false and misleading information); *Ellerbe v. Howard,* 29 Wage & Hour Cases (BNA) 568, 570 (W.D. N.Y. 1989)(attached) (maximum statutory damages awarded in default judgment for FLSA, AWPA and various state claims); *Cox v. Bissette,* 109 Lab. Cas. (CCH) ¶ 35,097, 45,762-45,763 (E.D. N.C. 1988) (attached); *Bohan v. Hudson,* 28 Wage & Hour Cas. (BNA) 357, 361 (E.D. N.C. 1987) (attached).

The case at hand is distinct from two 4th Circuit cases in which the Court declined to award the full $500.00 statutory award available for some of defendant's violations of the AWPA. In *Bautista v. Zuniga*, the Court relied on *Boyer v. Adams* to reason that the plaintiff's recovery of unpaid wages under his FLSA claim will adequately compensate him for violations of the AWPA for 29 U.S.C. §1822(a) (Failure to Pay Wages When Due) and 29 U.S.C. §1821(d) (Failure to Make, Keep, and Preserve Payroll Records). *Bautista*, 2012 U.S. Dist. LEXIS 48135 at 9 *citing Boyer v. Adams*, 2012 U.S. Dist. LEXIS 20892, 4, 2012 WL 530003 (E.D.N.C. Feb. 17, 2012) (attached).

---

[6] In his declaration, Mr. Galvan stated "The crewleader said that he was in charge of this camp. He yelled that I could not take any of his workers anywhere and that before I could enter his property, I had to ask his permission and he pounded his chest...He told me that he does not want anyone to visit his workers."

However, with respect to 29 U.S.C. §1822(a) (Failure to Pay Wages When Due), neither counsel for plaintiff nor the Court in *Boyer* and *Bautista* considered that statutory damages for a violation of this provision is not duplicative of FLSA because of the deterrent goals of the AWPA. Although Defendant's deduction and failure to remit FICA taxes due also constitutes a FLSA minimum wage violation, granting an AWPA statutory damage for this violation is not duplicative. FLSA does not provide any specific damages for the deceitful action of failing to report and remit these taxes due to the appropriate agency. It merely allows recovery for the unlawful deduction, not for the failure to report. With no specific damages, FLSA provides no deterrent against said action. For example, merely ordering the infracting employer to properly report and pay the FICA taxes, while important to making the employee whole, does nothing to deter the employer from failing to report and remit FICA taxes in the future. By granting AWPA statutory damages for the failure to pay FICA taxes, the Court deters employers from said action in the future.

With respect to 29 U.S.C. §1821(d) (Failure to Make, Keep, and Preserve Payroll Records), the Court should also award full statutory damages because of the goal of deterrence under the AWPA. Defendant's payroll record deficiencies that form the basis for the AWPA violation helped Defendant further his trafficking scheme. Defendant's records in this case were incomplete and rife with inaccuracies. Defendant failed to generate complete and accurate records itemizing the *actual* deductions that he made from Plaintiffs' pay so he could conceal the true exploitative nature of Defendant's business model from his employers, the operators of the farm. The Court in *Boyer* and *Bautista* did not take into account that because the FLSA does not provide for any specific damages for these intentional acts, FLSA provides no deterrent against

said action. Based on the deterrence prong of the *Beliz* analysis, Plaintiffs in this case are entitled to the full $500.00 damage award for each AWPA violation.

### iii. TVPA Damages

Plaintiffs are also entitled to an award of actual damages for TVPA violations pursuant to 18 U.S.C.S. §1595 for violations of 18 U.S.C. §1589 (Forced Labor) and §1590 (Trafficking). However, in this case, since TVPA damages are duplicated by damages sought under FLSA and NCWHA, Plaintiffs seek to recoup their underlying TVPA damages through FLSA and NCWHA. Plaintiffs also seek an award of attorneys' fees pursuant to 18 USC §1595(a).

### 6. Plaintiffs are Entitled to an Award of Attorneys' Fees and Costs

If the Court grants this Motion, Plaintiffs seek $350.00 in costs for the filing fee of the action. Ex. 30, Affidavit of Counsel in Support of an Award of a Reasonable Attorneys' Fee and Expenses, ¶13. Plaintiffs further request $8,121.75 for time spent litigating this matter. *Id* at ¶11. Plaintiffs' therefore respectfully request that a total of $8,471.75 be paid to counsel, Legal Aid of North Carolina, Inc. for time and expenses. *See accompanying* Plaintiffs' Motion for an Award of Reasonable Attorneys' Fees and Expenses and supporting documents.

### V. CONCLUSION

Plaintiffs respectfully request that this Court enter Default Judgment against Defendant in the amount of $4683.00 for Plaintiff Lainez and $4,515.00 for Plaintiff Rivas, totaling $9,198.00 plus interest stemming from the judgment, as well as attorneys' fees and costs in the amount of $8,471.75. In addition, Plaintiffs respectfully request this Court to enjoin the Defendant from failing to report the wages paid to Plaintiffs to the Social Security Administration.

This 4th day of December, 2012.

Respectfully Submitted,


/s/ Caitlin Ryland
State Bar No. 38472
Email: Caitlinr@legalaidnc.org

Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Telephone: (919) 856-2180
Fax: (919) 856-2187
*Attorney for Plaintiffs*